CASE LOMBARDI & PETTIT
Attorneys At Law, a Law Corporation
John R. Dwyer, Jr.                    1445-0
    jdwyer@dwyerlaw.com
737 Bishop Street, Suite 2600
Mauka Tower
Honolulu, Hawaii 96813
Telephone:  (808) 286-4379
Facsimile:  (808) 523-1888


GLASER WEIL FINK HOWARD
AVCHEN & SHAPIRO LLP
Patricia L. Glaser ****               55668
    pglaser@glaserweil.com
Andrew Baum ****                      190397
    abaum@glaserweil.com
Alexander Kargher ****               259262
10250 Constellation Boulevard,
19th Floor
Los Angeles, California 90067
Telephone:  (310) 553-3000
Facsimile:  (310) 556-2920

*** Subject to Pending Admission
    *Pro Hac Vice*

Attorneys for Plaintiff
David Alexander Neuman

# UNITED STATES DISTRICT COURT

# DISTRICT OF HAWAII

| | |
|---|---|
| DAVID ALEXANDER NEUMAN, an individual,<br><br>Plaintiff,<br><br>v.<br><br>JEFFREY MARC HERMAN, an individual; HERMAN LAW FIRM, P.A., a Florida professional association; MARK F. GALLAGHER, an individual; and MICHAEL EGAN, III, an individual,<br><br>Defendants. | CASE NO.:   15-00105 JMS_RLP<br><br>Hon.<br>SECOND AMENDED<br>**COMPLAINT FOR:**<br><br>**1. MALICIOUS PROSECUTION**<br>**2. ABUSE OF PROCESS**<br>**3. DEFAMATION**<br>**4. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br>**5. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**<br>**6. FALSE LIGHT INVASION OF PRIVACY**<br><br>EXHIBITS A AND B<br>**JURY TRIAL DEMANDED** |

# INTRODUCTION

1.      Last year, the defendants concocted a despicable scheme to enrich themselves by inventing and then litigating totally false claims which they would then use to extort settlement payoffs.  They decided they would hold a press conference to announce a lawsuit, and then sue plaintiff David Alexander Neuman and accuse him (and three other defendants) of horrific and repeated acts of sexual contact, violence and abuse against defendant Michael Egan ("Egan").  Their clear expectation, confirmed by their subsequent actions, was twofold.

2.      First, Mr. Neuman is informed and believes that defendants expected that rather than fight these vicious and provably false claims, Mr. Neuman would simply choose to pay defendants a sum of money to settle the claims and end the litigation.

3.      Second, Mr. Neuman – who is an openly gay executive in the entertainment industry – is also informed and believes that defendants, after initiating public prelitigation marketing and publicizing litigation against Mr. Neuman, intended to contact other gay men in the entertainment industry to intimidate and extort fraudulent settlements from those men by threatening to ruin their lives forever by falsely asserting sexual abuse of young boys and having them forever associated with the worst demonic image of a gay man, a pedophile, if they did not agree to pay to "settle" the threatened litigation.

4.      Banking on the expectation that potential targets of their scheme would settle these heinous allegations to keep them from becoming public, defendants were motivated to make their allegations as egregious as possible.  In order to do that, and compound the already vile nature of their claimed sexual abuse, defendants claimed that Mr. Neuman began abusing Egan when he was 15 years old.  By this time, however, Egan was 31 years old.  Recognizing that the applicable statute of limitations created a huge obstacle (among other obstacles) for their contemplated lawsuit, defendants chose to take advantage of a Hawaiian state law which temporarily suspended the statute of limitations for claims brought in Hawaii for

984341

1    childhood sexual assault which occurred in that state.

2        5.      In order to take advantage of this law, however, defendants would have
3    to justify filing their suit in Hawaii.  In order to do this, they would have to not only
4    allege fictional claims of sexual abuse, but they would have to allege that this
5    purported abuse occurred in Hawaii (and thus was subject to the Hawaii statute).  In
6    other words, they would not only allege that Egan and Mr. Neuman were in Hawaii
7    together, but that while in Hawaii, Egan was sexually abused by Mr. Neuman.

8        6.      Defendants then put their plan in motion.  They announced, and then
9    held, a press conference on April 21, 2014 to publicly announce the allegations
10   against Mr. Neuman.  This press conference was well attended by the media.  Video
11   of the conference was streamed live globally and was distributed from numerous
12   sources on the internet, and the press conference received extensive coverage in the
13   electronic and print media as well (all of which remains readily available on the
14   internet today).

15       7.      At the same time, defendants filed their lawsuit in Hawaii (the "Hawaii
16   Suit") against Mr. Neuman.  In the Hawaii Suit, defendants claimed that Mr. Neuman
17   repeatedly sexually abused and exploited Egan during two separate trips to Hawaii
18   *some 15 years earlier*, in 1999.

19       8.      While defendants successfully launched their campaign to accuse
20   Mr. Neuman publicly of these horrific acts, they could not escape the fundamental
21   problem with their scheme:  The fact that the allegations were entirely made up and
22   were totally, and provably, false for a slew of reasons - beginning with the fact that
23   Mr. Neuman was *never on any trips to Hawaii* with Mr. Egan in 1999 or at any other
24   time.

25       9.      Additionally, defendants knew, or at least should have known, of the
26   following additional information, all of which objectively demonstrated that the
27   allegations made against Mr. Neuman were totally untrue:

28             a.      In prior litigation initiated by Egan in 2000 - *after the claimed*

1         **abuse by Mr. Neuman** - Egan admitted in a deposition, under

2         penalty of perjury and with his own counsel sitting next to him,

3         that he was not sexually abused by Mr. Neuman;

4     b.     In that same deposition, Egan admitted that he had never been to

5         Hawaii;

6     c.     Shortly after this deposition, Egan stated in an under-oath

7         declaration that he had only incidental social contact with

8         Mr. Neuman and that Mr. Neuman had always acted appropriately

9         towards him; and

10     d.     Prior to filing the complaint against Mr. Neuman, defendants'

11         agent had interviewed one of the individuals who was on both of

12         the trips to Hawaii in 1999 referenced by Egan in his complaint

13         and that individual stated that neither Mr. Neuman *nor* Egan were

14         present on either trip.

15     10.    Mr. Neuman responded to the Hawaii Suit by filing a Rule 12(b) motion

16 to dismiss and by serving a Rule 11 motion for sanctions, which collectively

17 presented this (and other) evidence demonstrating why Egan's claims were totally

18 fabricated. Once confronted with this evidence, Defendants dismissed the Hawaii

19 Suit and tacitly admitted that their claims were untrue. While defendants were not

20 able to extort a settlement from Mr. Neuman, Mr. Neuman is informed and believes

21 that they were able to use the threat of filing similar litigation to extort millions of

22 dollars in "settlements" from other prominent gay men.

23     11.    While the dismissal meant that the litigation against Mr. Neuman was

24 now over, it did nothing to rectify the tremendous damage that the allegations and

25 litigation caused him. As a result, Mr. Neuman has no choice but to invoke the legal

26 system to recover his damages, and restore his good name.

27                   **PARTIES**

28     12.    Plaintiff David Alexander Neuman is an individual residing in Los

984341

1    Angeles, California, with an intention to reside there indefinitely, and is therefore a

2    citizen of California.

3       13.    On information and belief, Michael F. Egan, III, is an individual residing

4    in Nevada, with an intention to reside there indefinitely, and is therefore a citizen of

5    Nevada. Egan was the plaintiff in the Hawaii Suit.

6       14.    On information and belief, Jeffrey Marc Herman is an individual residing

7    in Florida, with an intention to reside there indefinitely, and is therefore a citizen of

8    Florida. Herman was an attorney of record for Egan in the Hawaii Suit.

9       15.    On information and belief, Herman Law Firm, P.A., is a Florida

10    professional association, registered in Boca Raton, Florida, with its sole offices in

11    Boca Raton, Florida. Herman Law Firm was counsel of record for Egan in the

12    Hawaii Suit.

13       16.    On information and belief, Mark F. Gallagher is an individual residing in

14    Hawaii, with an intention to reside there indefinitely, and is therefore a citizen of

15    Hawaii. Gallagher was an attorney of record for Egan in the Hawaii Suit.

16       17.    Defendants Herman, Herman Law Firm and Gallagher are collectively

17    referred to as the "Lawyer Defendants."

18                                **JURISDICTION**

19       18.    This Court has subject matter jurisdiction over Mr. Neuman's claims

20    under 28 U.S.C. § 1332. Diversity exists as, on the one hand plaintiff Neuman is

21    citizen of California and, on the other hand, defendant Herman is a Florida citizen,

22    defendant Herman Law is a Florida private association, Egan is a Nevada citizen and

23    Gallagher is a Hawaii citizen. The amount in controversy exceeds the sum or value of

24    $75,000 exclusive of interest and costs.

25       19.    The Court has personal jurisdiction over Defendants because Defendants

26    availed themselves of this district when they filed the Hawaii Suit.

27                                   **VENUE**

28    Venue is properly in this District under 28 U.S.C. § 1391(b)(2), as a substantial part

984341

1   of the events giving rise to this action occurred in this District, including but not

2   limited to, the filing of the Hawaii Suit.

3                              **FACTUAL ALLEGATIONS**

4   **I.      Mr. Neuman's Background**

5          20.    Following his *summa cum laude* graduation from UCLA, where he was

6   elected to Phi Beta Kappa, Mr. Neuman was appointed as a White House Fellow by

7   President Ronald Reagan, and served on the White House staff, in the Office of

8   Cabinet Affairs.

9          21.    Mr. Neuman's career in media began as a management trainee at NBC in

10  the 1980s, where he rose in the ranks to become Vice President of Current Comedy

11  Programs and Vice President of Comedy Development, overseeing numerous Emmy-

12  winning, hugely popular programs including Cheers, the Golden Girls, and Family

13  Ties, among many others.

14         22.    Mr. Neuman took the reins of head of programming at the Channel One

15  Network in 1992.  Channel One was a national, in-school news network reaching an

16  audience of approximately seven million middle and high school students each

17  day.  During Mr. Neuman's tenure there, Channel One's programming won over 100

18  national awards for programming, journalism, education, and community service,

19  including one of the most prestigious awards for television news, the George Foster

20  Peabody Award.

21         23.    Later, at the Walt Disney Company, Mr. Neuman was in charge of the

22  Walt Disney Television and Touchstone Television divisions, overseeing programs

23  including Home Improvement, Ellen, Boy Meets World, and the Wonderful World of

24  Disney, among many others.  During Mr. Neuman's tenure he oversaw the

25  groundbreaking "Puppy" episode of Ellen for the studio, which was watched by 42

26  million viewers and won an Emmy and Peabody Award.

27         24.    While still at the Walt Disney Company, Mr. Neuman was approached to

28  become the president of a startup called Digital Entertainment Network (DEN), a

984341

1   pioneer in the creation of original, television-style video content for the

2   internet.  Mr. Neuman oversaw the production division of the company that created

3   original scripted and unscripted multimedia comedy and drama programs, as well as

4   news, sports, music programming and advertising geared toward young, internet-

5   centric audiences.

6          25.    Subsequent to DEN, Neuman became the Chief Programming Officer of

7   CNN, overseeing the network's program development and talent functions, among

8   numerous other responsibilities.  Mr. Neuman actively participated in the network's

9   coverage of the events of September 11, 2001.

10         26.    Following his service at CNN, he was recruited by former Vice President

11  Al Gore and Mr. Gore's business partner, Joel Hyatt, to become the founding head of

12  programming for the startup Current TV, an innovative new multi-platform news and

13  information network, eventually sold to Al Jazeera in a deal that Forbes magazine

14  reported to be approximately $500 million.

15         27.    Mr. Neuman has followed a path of public service which began in

16  Washington, D.C.  In addition to being honored in 1998 for his public service by his

17  national fraternity, Lambda Chi Alpha, in as a recipient of its Order of Achievement,

18  in 2007 Mr. Neuman was awarded the Los Angeles Superior Court's Volunteer of the

19  Year for his 24-year tenure of volunteer advocacy for children in the dependency

20  system.

21  **II.    Defendants File The Hawaii Suit And Hold Their Press Conference**

22         28.    On information and belief, Defendants formally began their scheme on

23  April 16, 2014, when they filed a lawsuit entitled *Michael F. Egan v. Bryan Jay*

24  *Singer*, United States District Court, District of Hawaii Case Number 14-00177 (the

25  "*Singer* Case").  The *Singer* Case accused then-defendant Bryan Singer ("Singer"), a

26  successful Hollywood director, of sexually abusing Egan, when Egan was a minor, in

27  Los Angeles, California and during two trips to Hawaii in 1999.

28         29.    Upon the filing of the *Singer* Case, Defendants Egan and Herman

1  conducted a press conference at the Four Seasons Hotel in Beverly Hills, California.

2  They told the press that Singer had sexually abused Egan for a period of a few years,

3  both in California and during trips, including trips to Hawaii, "where he was also

4  sexually abused."

5      30.·   Not content with just leveling these allegations against Singer, Herman a

6  day or two later issued a press release announcing that he would be filing more sexual

7  abuse lawsuits against three other Hollywood executives whom he claimed were "part

8  of a Hollywood sex ring."  To hold the world in suspense, his press release teased that

9  the names of these three executives would be revealed at a second press conference,

10  which he scheduled for the following day (Monday, April 21).  This second press

11  conference was also scheduled for the Four Seasons Hotel in Beverly Hills,

12  California, and Herman notified the press that he would pay for valet parking for any

13  members of the press who attended the conference.  His press release also promised

14  that copies of the new lawsuits would be available at the press conference.  The full

15  text of Herman's press release stated is as follows:

***MEDIA ALERT***

NEWS CONFERENCE MONDAY AT 2PM

HOLLYWOOD EXECUTIVES TO BE NAMED IN SEXUAL
ABUSE LAWSUITS FILED MONDAY

WHAT: JEFF HERMAN (www.hermanlaw.com), a nationally-recognized
attorney for victims of sexual abuse, announces the filing of three lawsuits
against Hollywood executives alleging the sexual abuse of an underage boy.
The victim alleges that the three executives were part of a Hollywood sex ring.
In a lawsuit filed last week he alleged he was sexually abused by X-Men

director Bryan Singer who was part of the Hollywood sex ring. The names of the executives will be revealed at the news conference.

Copies of the filed complaint will be available at the news conference.


WHEN: Monday, April 21st, 2014 at 2pm (PST)

WHERE: Four Seasons Hotel in Beverly Hills

300 South Doheny Drive, Los Angeles, CA 90048


*Valet is courtesy of Herman Law (Tickets will be validated at the news conference)


WHO: Michael Egan, his mother, and attorney Jeff Herman


CONTACT: Kayla Repan 305-931-2200; krepan@hermanlaw.com

*See* Exhibit A.

31.    On information and belief, Herman and/or the Herman Law Firm caused this press release to be widely circulated to various media sources. They also caused it to be made available on the Herman Law Firm's website, where it remains available and viewable as of the date of this Complaint.

32.    The next day, Monday April 21, 2014, Defendants filed three lawsuits in Federal Court in Hawaii. One of those was the Hawaii Suit. The other two were filed against Garth Ancier and Gary Goddard, both of whom are successful Hollywood executives as well.

33.    Like the *Singer* case filed a few days earlier, the three suits filed on April 21, 2014 begin by alleging that in 1998, Egan began working as a child actor for an online entertainment business known as Digital Entertainment Network ("DEN"). He alleged that he was then repeatedly sexually assaulted by the principals of DEN, Marc Collins-Rector ("Collins-Rector") and Chad Shackley ("Shackley") at their home in

1  Los Angeles.

2      34.    The Hawaii Suit then goes on to allege that Neuman himself – then the

3  president of DEN – also repeatedly sexually assaulted Egan, at the Collins-

4  Rector/Shackley home and in conjunction with Collins-Rector/Shackley's alleged

5  abuse, over a one to two year period.  The Hawaii Suit further alleges that

6  Mr. Neuman was part of a "sordid sex ring" in which Mr. Neuman, along with

7  Collins-Rector, Shackley and other prominent gay men, used their positions within in

8  the entertainment industry to sexually exploit Egan.

9      35.    While the allegations against Mr. Neuman were verifiably false and

10  maliciously false, defendants recognized that they were barred by California's statute

11  of limitations.  Thus, in order to forum shop their claim into the still-open Hawaii

12  statute of limitations, defendants also alleged that Egan went to Hawaii twice in 1999

13  with Collins-Rector and Shackley, that Mr. Neuman went on both trips, and that he

14  also sexually abused Egan during those trips.

15      36.    While the Hawaii Suit was being filed on April 21, 2014, Herman and

16  Egan (along with Egan's mother) conducted the press conference they announced in

17  their press release.  During that conference, Herman summarized the sordid claims

18  that they were asserting against Mr. Neuman (with Egan sitting next to him):

19          "The third name and the third lawsuit I filed today was against

20          David Neuman.  We allege that David Neuman was a

21          participant in the Hollywood sex ring. That he participated in

22          supplying Mike with drugs and alcohol coerced him into having

23          sex at 15 years old on through 17 in Hawaii."

24      37.    Shortly after the press conference concluded, Herman and/or Herman

25  Law modified the press release announcing the filing of these three lawsuits to

26  identify Mr. Neuman as being one of the defendants, and to provide an internet link to

27  the Hawaii Complaint for anybody who wished to have a copy.

28  **III.**    **Mr. Neuman Retains Counsel And Then Provides Defendants With**

984341

**Objective and Verifiable Proof that the Claims Against Him Are Not True**

38.    Mr. Neuman immediately retained counsel, and counsel sent the Lawyer Defendants a letter on April 24, 2014 which indicated they were representing Mr. Neuman.  This letter further indicated that Mr. Neuman had unequivocal and uncontroverted evidence that proved that the claims against him were unfounded, asserted that the Lawyer Defendants did not conduct the factual investigation required by Rule 11 and demanded that the lawsuit be dismissed.  It ended by advising that counsel would accept service of the Hawaii Suit if Defendants improvidently intended to continue with the litigation.

39.    The very next day, Lee Cohen, an attorney who works for Herman Law, responded with a letter suggesting that the parties "dispense with the usual discovery formalities" and asking for the documents and evidence which Mr. Neuman contended demonstrated that the claims against him were not true.

40.    Gallagher that same day wrote his own letter and asked for this same evidence.

41.    In response, Mr. Neuman's counsel invited the Lawyer Defendants (along with Mr. Cohen) to meet in person so that they could share evidence with each other.

42.    Gallagher responded by saying he was not available and declined to meet.  Herman, through Mr. Cohen, indicated that he too was not available but proposed an alternate day for that meeting.

43.    Meanwhile, Gallagher a few days later (on May 1, 2014) sent a letter requesting that Mr. Neuman waive the requirement of service.  Gallagher's letter attached pre-printed forms to effectuate the waiver of service and provided a postage-paid envelope to return the forms once signed.

44.    Similarly, a week later (on May 7, 2014), Gallagher sent a 7 page letter purporting to advise Mr. Neuman and his counsel of their obligation to preserve evidence.

45.   Meanwhile, Herman met in person with Mr. Neuman's counsel on May 6, 2014 to exchange evidence and information about the case. Herman claimed during that meeting that he had conducted an investigation before filing suit, but only identified one person with whom he claimed to have spoken before the Hawaii Suit was filed – Chad Shackley. Herman admitted that Shackley was one of the other individuals whom Egan claimed sexually abused him, but Herman claimed that Shackley confirmed that Neuman had abused Egan as well.

46.   Counsel also discussed the evidence demonstrating Mr. Neuman's innocence. They discussed how, back in 2000, Egan filed a suit in the Los Angeles Superior Court (the "2000 Action") that mirrored the claims Egan was now asserting. They discussed how, in the 2000 Action, Egan claimed that while he was a child actor for DEN, he was repeatedly sexually abused and molested at the Collins-Rector/Shackley home by Collins-Rector, Shackley and another DEN

47.   founder – Brock Pierce ("Pierce").

48.   Counsel also discussed the impact of this lawsuit, which Herman admitted litigated essentially the same underlying claims as alleged in the Hawaii Suit. Counsel also pointed out that while Egan was litigating the issue of his alleged sexual abuse by DEN founders in the 2000 Action, he did not claim that Mr. Neuman (or anyone else) had also engaged in any wrongdoing.

49.   Counsel also provided Herman with a two page declaration, signed by Egan himself in 2003, which among other things, stated *under oath* that:

      a.   "David Neuman has always acted appropriately towards me";

      b.   "I have never had any kind of physical contact with David Neuman other than what is normal and appropriate between non-sexual acquaintances: e.g., handshakes, etc."; and

      c.   "David Neuman has never been present when I was involved in

1   any type of sexual conduct, never harassed me, never made

2   sexually suggestive remarks to me, and never acted improperly

3   around me or toward me, on a personal or professional level."

4   *See* Exhibit B.

5       50.   Herman indicated that he had never seen this declaration before and did

6   not know of its existence.  Through counsel, Mr. Neuman demanded that Herman

7   dismiss the lawsuit with a public apology.  Herman said he would talk to Egan,

8   promised to then contact Mr. Neuman's counsel, and left the meeting.  Herman never

9   made the promised contact.

10  **IV.   Mr. Neuman Discovers that Defendants Filed The Hawaii Suit Even**

11  **Though Their Preliminary Investigation Confirmed That Mr. Neuman**

12  **Was Not in Hawaii with Egan**

13      51.   After meeting with Herman, Mr. Neuman's counsel contacted the only

14  individual that Herman indicated was contacted as part of his investigation and whom

15  supported Egan's claims – Chad Shackley.

16      52.   Shackley confirmed that he and Collins-Rector went on two trips to

17  Hawaii in or around 1999.  He stated that Mr. Neuman was not on the first trip, and

18  he has no recollection of Mr. Neuman being on the second one.  And, perhaps even

19  more astonishing, he stated that he did not recall *Egan* being on either trip either!

20      53.   Shackley also said that he was contacted, and then visited in person, by

21  an investigator who stated that he worked for Herman and the Herman Law Firm.  He

22  said that he told the investigator this same information, *i.e.,* that neither Egan nor

23  Neuman were on the Hawaii trips.

24      54.   In other words, the Lawyer Defendants filed the Hawaii Suit after the

25  sole witness they identify speaking with as part of their pre-litigation "investigation"

26  told them that neither Mr. Neuman nor Egan were in Hawaii during the trips which

27  formed the basis for their suit in Hawaii.

28

984341

**V.     Defendants Do Not Dismiss the Hawaii Suit So Mr. Neuman Moves for Dismissal and Serves A Rule 11 Sanctions Motion**

55.     Having not heard promptly from Herman after in-person meeting, Mr. Neuman's counsel sent Herman a letter dated May 13, 2014 to follow up on their discussion. The letter discussed the declaration signed by Egan, and provided a copy of the declaration signed by Shackley stating that neither Mr. Neuman nor Egan were on the Hawaii trips.

56.     This letter also provided further information demonstrating why defendants' claims were verifiably false. It quoted certain portions of the deposition testimony that Egan gave in the 2000 Action. Specifically, it quoted Mr. Egan's testimony stating that he had never taken a trip with Collins-Rector and Shackley "outside the continental U.S." (i.e. in Hawaii). The letter also pointed out that when Mr. Egan was asked if anybody else besides Collins-Rector, Shackley and Pierce had sexually assaulted him, he admitted under oath: "There was other people that worked down in the DEN facilities, but partaking in all this stuff, I don't think so, no."

57.     The letter closed by noting that the filing of the Hawaii Suit violated the Lawyer Defendants' Rule 11 obligations and repeated Mr. Neuman's demand that the Hawaii Suit be dismissed with prejudice and with a written apology.

58.     Defendants did not respond to this letter within the timeframe requested. As a result, Mr. Neuman filed a Motion to Dismiss the action for lack of personal jurisdiction, arguing that he was not in Hawaii during the two trips alleged in the Hawaii Suit.

59.     Mr. Neuman's Motion to Dismiss was supported, in part, by the Egan declaration discussed above where he admitted that Mr. Neuman did not engage in any wrongdoing, sexual or otherwise, toward Egan (and thus could not be subject to jurisdiction in Hawaii for Egan's claims). It was also supported by declarations from Shackley and **five other individuals** who confirmed that Mr. Neuman was not present on the Hawaii trips alleged in the Hawaii Suit.

984341

60. At the same time, Mr. Neuman served a motion for sanctions against the Defendants for filing the Hawaii Suit without any factual support in violation of Rule 11 of the Federal Rules of Civil Procedure. This Sanctions motion argued that defendants failed to conduct the investigation mandated by Rule 11 before filing the Hawaii Suit, as evidenced by, among other things:

    a. Shackley's telling Herman's investigator, before the complaint was filed, that neither Mr. Neuman nor Egan were on the Collins-Rector/Shackley trips to Hawaii;

    b. Egan's under-oath deposition testimony in connection with his prior lawsuit against Collins-Rector, Shackley and Pierce, where testified that he was not sexually assaulted by anyone other than those three defendants; and

    c. Egan's under-oath declaration stating that Mr. Neuman did not engage in any improper conduct, sexual or otherwise, with Egan.

61. The Rule 11 motion also argued that Herman's and Egan's press conference, where they announced the claims against Mr. Neuman, was improper and clearly designed to create a media circus to generate the maximum public exposure possible, thereby publicly abusing and smearing Mr. Neuman's family, reputation and career.

62. Approximately one week after the Motion to Dismiss was filed and the Motion for Sanctions was served, Herman reportedly told the press that Egan had taken and passed a polygraph test "relating to the allegations he had made." Thus, even when faced with these two motions, Herman was still telling the press that Egan's allegations were well founded.

63. While Herman (and Egan) showed no hesitation making their allegations against Mr. Neuman to the press, they refused to even attempt to defend them before the Court. On the day before Mr. Neuman could file his motion for sanctions, Defendants on June 4, 2014 dismissed the Hawaii Suit so as to ensure that they would

1  **_not_** have to justify their actions, support their claims, or explain how they could have

2  filed the Hawaii Suit when it was directly refuted by two separate, under-oath

3  admissions by Egan as well as the under-oath testimony of numerous witnesses,

4  including at least one whom they spoke with, all of whom said that Mr. Neuman was

5  never in Hawaii with Egan.

6       64.    While the dismissal ended the Hawaii Suit, it did not end the terrible

7  damage that Mr. Neuman suffered as a result of the maliciously false allegations

8  against him.  The allegations remain quickly and easily found – a Google search of

9  Mr. Neuman's name as of the date of this complaint reveals that ten of the first twelve

10  websites listed by Google report on Egan's allegations.  Defendants' malicious and

11  false allegations have left a strong, negative mark on Mr. Neuman's reputation which

12  can only be corrected by this legal action.

13          **FIRST CLAIM FOR RELIEF FOR MALICIOUS PROSECUTION**

14                    **(Against All Defendants)**

15       65.    Mr. Neuman realleges and incorporates herein by reference all of the

16  preceding and following paragraphs of this Complaint.

17       66.    The Defendants initiated and maintained the Hawaii Suit against

18  Mr. Neuman with knowledge that the Hawaii Suit lacked probable cause to as to any

19  claim alleged therein against Mr. Neuman.

20       67.    On June 4, 2014, Defendants voluntarily dismissed the Hawaii Suit in

21  Mr. Neuman's favor, following Mr. Neuman's filing of a Motion to Dismiss and his

22  service of a Rule 11 Motion, both of which were based, in part, on prior sworn

23  statements of Egan that contradicted the allegations in the Hawaii Suit and which

24  rendered the Hawaii Suit unmeritorious.

25       68.    At all relevant times, Defendants acted maliciously and without probable

26  cause in bringing and perpetuating the Hawaii Suit because they did not honestly and

27  reasonably believe that there were grounds for any of the claims alleged in the Hawaii

28  Suit.

984341

69.   In initiating and perpetuating the Hawaii Suit without any probable cause, Defendants acted primarily for a purpose other than attempting to succeed on the merits of the claims stated therein (which they knew they could not do).  Instead, Mr. Neuman is informed and believes that defendants brought the Hawaii Suit in an attempt to, among other things:

a.   induce Mr. Neuman to pay defendants money to settle their baseless claims against Mr. Neuman;

b.   cause other individuals who learned about the Hawaii Suit to contact the Lawyer Defendants and retain them to represent them in other litigation;

c.   annoy and harass Mr. Neuman; and

d.   damage Mr. Neuman's reputation and prejudice him.

70.   As a direct and proximate result of Defendants' conduct, Mr. Neuman was forced to expend a significant amount of time and money in defending against the meritless Hawaii Suit.  Further, Mr. Neuman suffered significant harm to his personal reputation and business standing in the community as well as severe mental and emotional distress.  These damages have resulted in harm to Mr. Neuman in an amount in excess of the jurisdictional limit of the Court.  The conduct of Defendants, individually and collectively, was a substantial factor and proximate cause in bringing about Mr. Neuman's harm.

71.   In initiating and continuing the Hawaii Suit, Defendants acted with oppression, fraud, and malice, including, but not limited to, acting with an intent to subject Mr. Neuman to cruel and unjust hardship in conscious disregard to Mr. Neuman's rights.  These acts justify the awarding of punitive damages against the defendants, and each of them.

## SECOND CLAIM FOR RELIEF FOR ABUSE OF PROCESS
### (Against All Defendants)

72.   Mr. Neuman realleges and incorporates herein by reference all of the

1   preceding and following paragraphs of this Complaint.

2      73.   Mr. Neuman is informed and believes that Defendants' initiation and

3   publication of the Hawaii Suit was done for an ulterior purpose and motive wholly

4   separate from the purported purpose of the litigation (*i.e.*, to prosecute a claim of

5   sexual abuse).  To the contrary, Mr. Neuman is informed and believes that the Hawaii

6   Suit was initiated so that it could be publicized and become well known within the

7   entertainment industry so that the Lawyer Defendants could then contact other gay

8   men in the entertainment industry and intimidate and extort fraudulent settlements

9   from those men by threatening them with similar allegations that they sexually abused

10   young boys if they did not agree to pay funds to the Lawyer Defendants.

11      74.   Mr. Neuman is also informed and believes that Defendants also initiated

12   and publicized the Hawaii Suit in an attempt to troll for additional plaintiffs who,

13   having read about the litigation, would then contact the Lawyer Defendants and seek

14   their representation to assert other sexual assault claims.

15      75.   Mr. Neuman is informed and believes that Defendants were successful in

16   their ulterior purpose and motivation, in that after the publication of the Hawaii Suit,

17   the Lawyer Defendants were able to secure additional plaintiffs and then intimidated

18   and threatened litigation similar to the Hawaii Suit to extort "settlement" funds from

19   third parties who chose to pay rather than be subjected to litigation tactics that

20   defendants' levied on Mr. Neuman.

21      76.   As a direct and proximate result of Defendants' conduct, Mr. Neuman

22   was forced to expend a significant amount of time and money in defending against the

23   meritless Hawaii Suit.  Further, Mr. Neuman suffered significant harm to his personal

24   reputation and business standing in the community as well as severe mental and

25   emotional distress.  These damages have resulted in harm to Mr. Neuman in an

26   amount in excess of the jurisdictional limit of the Court.  The conduct of Defendants,

27   individually and collectively, was a substantial factor and proximate cause in bringing

28   about Mr. Neuman's harm.

77.   In initiating and continuing the Hawaii Suit, Defendants acted with oppression, fraud, and malice, including, but not limited to, acting with an intent to subject Mr. Neuman to cruel and unjust hardship in conscious disregard to Mr. Neuman's rights.  These acts justify the awarding of punitive damages against the defendants, and each of them.

### THIRD CLAIM FOR RELIEF FOR DEFAMATION
### (Against Defendants Egan, Herman and Herman Law)

78.   Mr. Neuman realleges and incorporates herein by reference all of the preceding and following paragraphs of this Complaint.

79.   On April 20, 2014, Herman issued a press release on his website which stated that he was going to announce the filing of three new lawsuits on behalf of Egan and identify three more Hollywood executives who sexually assaulted young boys.

80.   The following day, April 21, 2014, Herman and Egan held a press conference where numerous false and unprivileged statements about Mr. Neuman were made by Herman and Egan, including statements that:

a.     "David Neuman was a participant in the Hollywood sex ring";

b.     Mr. Neuman "participated in supplying Mr. Egan with drugs and alcohol"; and

c.     Mr. Neuman "coerced Mr. Egan into having sex at 15 years old on through 17 years old in Hawaii."

81.   The press conference was well attended by the media.  Video of the conference was streamed live globally and was distributed from numerous sources on the internet, and the press conference received extensive coverage in the electronic and print media as well (all of which remains readily available on the internet today).

82.   That same day, Defendant Herman updated the press release on his firm's website so that it now identified Mr. Neuman as one of the Hollywood executives who defendants accused had sexually assaulted Egan.

83. The statements made in the press release and during the press conference were false and defamatory statements accusing Mr. Neuman of committing criminal and sexual misconduct when, in fact, Mr. Neuman had never engaged in any such conduct and when defendants knew, or at the very least should have known, that Mr. Neuman had not engaged in such conduct.

84. The statements above also constitute libel and slander *per se* in that they accuse Mr. Neuman of serious criminal and sexual misconduct.

85. As a direct and proximate result of Defendants' conduct, Mr. Neuman was forced to expend a significant amount of time and money in defending against the meritless Hawaii Suit. Further, Mr. Neuman suffered significant harm to his personal reputation and business standing in the community as well as severe mental and emotional distress. These damages have resulted in harm to Mr. Neuman in an amount in excess of the jurisdictional limit of the Court. The conduct of Defendants, individually and collectively, was a substantial factor and proximate cause in bringing about Mr. Neuman's harm.

86. In initiating and continuing the Hawaii Suit, Defendants acted with oppression, fraud, and malice, including, but not limited to, acting with an intent to subject Mr. Neuman to cruel and unjust hardship in conscious disregard to Mr. Neuman's rights. These acts justify the awarding of punitive damages against the defendants, and each of them.

## FOURTH CLAIM FOR INTENTIONAL
## INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

87. Mr. Neuman realleges and incorporates herein by reference all of the preceding and following paragraphs of this Complaint.

88. As set forth above, the defendants initiated and publicized the Hawaii Suit without any cause or justification and then made outrageous statements about Mr. Neuman which alleged that Mr. Neuman sexually abused Egan when he was

984341

1   between the ages of 15 and 17 years old in a press conference before a worldwide
2   audience, all in their intentional and/or reckless attempt to secure a settlement from
3   Mr. Neuman and to serve as a basis to locate additional plaintiffs and to intimidate
4   and extort "settlements" from other gay men in the entertainment industry.

5       89.   Defendants' conduct was outrageous by any objective standard, was
6   without cause or excuse, exceeded all bounds of decency and was intended to cause
7   Mr. Neuman to suffer severe emotional distress and psychological trauma, including,
8   without limitations, humiliation, worry, anxiety, anguish, suffering and grief.

9       90.   This emotional distress and psychological trauma has caused
10   Mr. Neuman damages in an amount in excess of the Court's jurisdictional minimum.

11      91.   In engaging in the conduct set forth above, Defendants acted with
12   oppression, fraud, and malice, including, but not limited to, acting with an intent to
13   subject Mr. Neuman to cruel and unjust hardship in conscious disregard to
14   Mr. Neuman's rights.  These acts justify the awarding of punitive damages against the
15   defendants, and each of them.

16           **FIFTH CLAIM FOR NEGLIGENT**
17       **INFLICTION OF EMOTIONAL DISTRESS**
18           **(Against All Defendants)**

19      92.   Mr. Neuman realleges and incorporates herein by reference all of the
20   preceding and following paragraphs of this Complaint.

21      93.   As set forth above, the defendants initiated and publicized the Hawaii
22   Suit without any cause or justification and made outrageous statements about
23   Mr. Neuman which alleged that Mr. Neuman sexually abused Egan when he was
24   between the ages of 15 and 17 years old in a press conference before a worldwide
25   audience, all in an attempt to secure a settlement from Mr. Neuman and to serve as a
26   basis to locate additional plaintiffs and to intimidate and extort "settlements" from
27   other prominent gay men.

28      94.   Defendants' conduct was outrageous by any objective standard, was

1  without cause or excuse, exceeded all bounds of decency and caused Mr. Neuman to

2  suffer severe emotional distress and psychological trauma, including, without

3  limitations, humiliation, worry, anxiety, anguish, suffering and grief.  Indeed, a

4  reasonable man, normally constituted, would be unable to adequately cope with the

5  mental stress engendered by the Defendants' conduct.

6     95.   This emotional distress and psychological trauma has caused

7  Mr. Neuman damages in an amount in excess of the Court's jurisdictional minimum.

8  **SIXTH CLAIM FOR FALSE LIGHT INVASION OF PRIVACY**

9  **(Against Egan, Herman and Herman Law)**

10    96.   Mr. Neuman realleges and incorporates herein by reference all of the

11  preceding and following paragraphs of this Complaint.

12    97.   As set forth above, Herman and Egan held a press conference where

13  numerous false and unprivileged statements about Mr. Neuman were made by

14  Herman and Egan, including statements that:

15        a.   "David Neuman was a participant in the Hollywood sex ring";

16        b.   Mr. Neuman "participated in supplying Mr. Egan with drugs and

17             alcohol"; and

18        c.   Mr. Neuman "coerced Mr. Egan into having sex at 15 years old on

19             through 17 years old in Hawaii."

20    98.   The press conference was well attended by the media.  Video of the

21  conference was streamed live globally and was distributed from numerous sources on

22  the internet, and the press conference received extensive coverage in the electronic

23  and print media as well (all of which remains readily available on the internet today).

24    99.   That same day, Defendant Herman updated the press release on his

25  firm's website so that it now identified Mr. Neuman as one of the Hollywood

26  executives who defendants accused had sexually assaulted Egan.

27    100.  The statements made in the press release and during the press conference

28  were false and defamatory statements accusing Mr. Neuman of committing criminal

21
COMPLAINT

1   and sexual misconduct when, in fact, Mr. Neuman had never engaged in any such

2   conduct and when defendants knew, or at the very least should have known, that

3   Mr. Neuman had not engaged in such conduct.

4        101.   Egan, Herman and Herman Law invaded Mr. Neuman's privacy because

5   they placed Mr. Neuman in a false light that would be highly offensive to a

6   reasonable person, and Egan, Herman and Herman Law had knowledge of or acted in

7   reckless disregard as to the falsity of the statements and the false light in which

8   Mr. Neuman was being placed.

9        102.   This invasion of privacy has caused Mr. Neuman damages in an amount

10   in excess of the Court's jurisdictional minimum.

11   ## PRAYER FOR RELIEF

12        WHEREFORE, Mr. Neuman prays for relief as follows:

13        1.   For special damages including attorneys' fees and other costs in

14   defending the Lawsuit, damage to reputation, psychological trauma, and harm to

15   business interests, in an amount to be proven at trial in excess of $1 million;

16        2.   For general damages according to proof at trial;

17        3.   For attorneys' fees and costs of suit herein;

18        4.   For punitive damages in such an amount as the Court may deem

19   appropriate to penalize Defendants for their intentional and malicious conduct;

20        5.   For prejudgment interest; and

21        6.   For such other relief as the Court may deem Mr. Neuman entitled to

22   receive.

23

24

25

26

27

28

984341

## DEMAND FOR JURY TRIAL

Plaintiff David Alexander Neuman hereby demands a jury trial of all issues in this action triable as of right by a jury.

DATED:  March 22, 2015

Respectfully submitted,

CASE LOMBARDI & PETTIT

By: _____

JOHN R. DWYER, JR.

Attorneys for Plaintiff
DAVID ALEXANDER NEUMAN

984341